SAMUEL GRANT v. ALICE C GRANT.[1]

April 24, 1896.

Nos. 9723—(27).

**Divorce—Desertion—Evidence.**

Evidence considered, and *held* that it sustains a finding of the trial court that the defendant was not guilty of deserting the plaintiff.

Appeal by plaintiff from a judgment of the district court for Rice county, in favor of defendant, entered in pursuance of the findings and order of Russell, J. Affirmed.

*Geo. N. Baxter*, for appellant.

*A. R. Pfau*, for respondent.

CANTY, J. This is an appeal by the plaintiff from a judgment denying him any relief in an action for divorce brought on the statutory ground of willful desertion of him by defendant for three years immediately prior to the commencement of the action.

Plaintiff and defendant were married at Faribault, Minnesota, February 4, 1891. He was then 27 years of age, and she was 21. They spent the next five or six weeks on a wedding trip, on which they began to have petty quarrels. On their return they took up their residence at his father's house in Faribault; but from that time until after they separated, plaintiff spent the greater part of his

1 Reported in 66 N. W. 983.

time at Duluth, Minnesota, where he was engaged in his father's business of railroad building. Defendant spent the time until April 24 between his father's house and her father's house, which were on adjoining parcels of land at Faribault. Then she went to Duluth with plaintiff, and remained with him at an hotel until May 4, when she went on a visit to St. Paul, Minneapolis, and Mankato, against his protest, returning to him at Duluth, May 13, where they remained until May 24, when they both returned to Faribault. During this time they had several petty quarrels,—on one occasion, as to what sort of a dress she should wear at the theater; on another, as to whether he would take her to the theater; had some little difference as to his refusal to put away her hat when they arrived there, and her requesting another gentleman accompanying them to put it away. They both left Duluth on the 24th, in ill humor. She wanted to remain longer, to entertain friends whom she had invited to dine that evening, and to attend a party to which she and plaintiff had been invited for the next evening. But he suddenly took a notion to come home to Faribault, and she was much put out at his refusal to stay a day or two longer. On their arrival at Faribault she ordered her trunk sent to her father's house. They called first on his family, and then on her family, with whom she remained all night, refusing to return with him to his father's house, to which he returned, and remained there all night. He came over in the morning, and tried to get her to return to his father's house, but she still refused. Some time previous to this, in one of their quarrels, he had told her that his sisters (who resided at his father's house) could hardly treat her decently, and he did not blame them. She testified that he then promised that he would not ask her longer to live there, and gives these facts as the reason for her refusal to go back to live with his family. He returned to Duluth in a day or two, where he remained until May 30, when he again returned to his father's house, where she also returned, on the solicitation of his father, mother, and sister, and remained with plaintiff until the morning of June 2, when he was again about to depart for Duluth.

As to what occurred that morning, defendant testified as follows: "I asked him where he was going that morning, and he said

he was going to the devil, and violently slammed the door. I knew I must ask no more questions, but I got up and dressed, and went down to breakfast with him alone. No one else was up in the house, and he went and got his grips, and came out in the hall, and kissed his sister good-by; and I stepped forward and said, 'Good-by, Samuel;' and he said, 'God damn you; go to the devil,' pushing me very violently against the door, and I kind of fell down; and Kate, his sister, says, 'Samuel Grant, you ought to be ashamed of yourself.' I think it was she, and I think that is what she said. It was simply more than I could stand, so I finally picked up my things and went home. * * * He came back the following Saturday night, and came over to the house, and wanted to know if I would go over home; and all this time the entire family had been going by our house, and not speaking to me, and I sitting there all the while; and always before that they had looked towards the house, and towards me. I told him I couldn't go; that it was impossible; that they had refused to speak to me, and had not spoken to me for over three days, except his mother and one sister. And he said that it was his home, and I should go there. I told him I would go any place, and suggested two or three places in town,— hotels. He stated that I should go there, or no place." This was June 6 or 7. She further testified that the Grant family had treated her well up to the time she went to Duluth. But, said she: "I had been tolerated, but I could see a feeling back of it; and I asked him not to let me go back, and he said he would not." On June 10 he again asked her to return, but she refused. Said she: "I pleaded with him to take me somewhere else. I told him I would go anywhere else." This was their last interview. During this time several members of plaintiff's family tried, evidently in the best of faith, to bring about a reconciliation; but, when they could not immediately accomplish this result, they joined in to make the breach wider. The following communications subsequently passed between the parties:

"Faribault, Minn. June 14, 1891.    To Mrs. Samuel Grant—My Dear Wife: As I expect to leave for Duluth in the morning, to attend to my business, and having no opportunity of seeing you, I would like to say to you that I have provided a place for you to live, at my father's home, until such time as our own home is

completed. Hoping this will prove satisfactory to you, I am, truly your devoted husband. Samuel Grant."

"Faribault, Minn. July 14, 1891. My Dear Samuel: Are you still desirous of having me live at your father's home? Before you decide, I beg that you will give me an interview. If I have done wrong, I beg your pardon,—it seemed to be the only way. Hoping to hear from you soon, I remain your wife. Alice N. Grant."

"Duluth, Minn., July 21, 1891. To Mrs. Sam Grant, Faribault, Minn.—My Dear Wife: Your letter of July 14th rec'd, and contents noted. You received my letter of June 13th or 14th, saying where you would find your home. You may still follow those instructions, if you so desire. No interview is necessary. I will be down when I get a chance to leave my business. Your husband. Sam Grant."

Soon after their marriage, plaintiff commenced the erection of a new house at Faribault, intended as their future home, but soon after their separation he abandoned it. He continued going back and forth between Faribault and Duluth until December, when he went to Sioux Falls, South Dakota, for the purpose, it would seem, of gaining a residence and obtaining a divorce. He commenced a divorce suit there in September, 1892, and got judgment by default in December; but she appeared, and the judgment was set aside on her motion. The parties subsequently went to trial, and his action was dismissed. In the meantime she commenced an action for divorce in this state, which, after he was defeated in Dakota, she dismissed. He returned in March, 1893, to live permanently at Faribault, and has since brought this action.

There is not a great amount of conflict in the evidence as to any of the foregoing matters, and it is on these refusals of defendant to return and live with plaintiff, at his father's residence, that he predicates his claim of desertion on her part. From the memorandum of the judge of the court below, it seems that he based his decision for defendant on the ground that, under the circumstances, plaintiff's demand that she live with him at his father's house was unreasonable. We are of the opinion that the decision is justified by the evidence.

A large discretion must be given to the trial court in cases of this kind. As a matter of common knowledge, it is often the case

that a married person cannot live peaceably in the family of his or her father-in-law and mother-in-law. While the foregoing statement of the main facts disclosed by the evidence is sufficiently favorable to the plaintiff, it leaves out a large amount of the details and much of the atmosphere of the case, and in our opinion the divorce could easily have been denied on a broader ground.

After reading all the evidence, it is hard to escape the conclusion that these parties entered into the marriage relation without any appreciation of its duties or responsibilities. They acted after marriage like a pair of spoiled children, ready to quarrel over the most frivolous matters. They did not seem to be able to rise above their petty differences, and the slightest offense, real or imaginary, was nursed until it grew to be a mountain. They exhibited towards each other altogether too much false dignity, and too little real manhood and womanhood. It is hard to say, from this record, that either ever cared much for the consequences. If he was very anxious for a reconciliation, or even regarded the matter as anything more serious than the cost, in time and money, of procuring a Dakota divorce, it is hardly probable that he would have refused his wife's request for an interview, or insisted that she live at his father's house at that particular time. He could easily have taken her back to Duluth with him, and kept her there, or somewhere else, until the relations between her and his family were more cordial, or until his new house was finished. On the other hand, it is hard to say that she ever met him with the deep desire of a true wife for a genuine reconciliation. On the contrary, her conduct, on many occasions, would indicate that she was indifferent as to their future relations; and even on the morning when she offered to kiss him good-by, and he pushed her away, it would seem, from all the evidence, that she approached him in an indifferent, insincere manner, to demand that on his departure he recognize her as well as he had recognized his sister. She was indifferent to the appeals of his father, mother, and sister that she return to him, and neither of the parties seemed to have had much concern about the outcome of the matter. While the parties did not mutually agree to live apart, the evidence would strongly support a finding that they mutually refused to live together, and the reason given by each for such refusal was a mere pretext. In such a case neither party

would be entitled to a divorce.   We make these comments because this is a type of case altogether too common in our divorce courts.

Judgment affirmed.